UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.

BENANCIO CASTANEDA (1),

     Defendant.

No. 1:21-CR-031-H-BU-1

**MEMORANDUM OPINION AND ORDER**
**DENYING MOTION TO SUPPRESS EVIDENCE**

Before the Court is Benancio Castaneda's Motion to Suppress Evidence, which alleges that (1) officers prolonged a traffic stop beyond the time reasonably necessary to investigate Castaneda's traffic violation, and (2) he was the subject of an unlawful search when a drug dog stuck her head through his open car window and sniffed. Dkt. No. 42. Having reviewed the briefing and considered the evidence admitted during the suppression hearing, including the officers' credible testimony, the Court denies the motion.

First, even if the traffic officer's actions were not reasonably related in scope to the circumstances that justified the stop, there was no Fourth Amendment violation because the officer developed reasonable suspicion of additional criminal activity in the course of the stop and before the initial purpose of the stop had been fulfilled. The officer knew that Castaneda (1) was being surveilled by narcotics investigators; (2) lied about where he was traveling from; (3) gave inconsistent stories about his prior whereabouts; and (4) had his driver's license suspended for failing to complete a drug-education program. Additionally, when speaking with the officer, Castaneda exhibited signs of atypical nervousness—refusing to make eye contact, being jittery and combative, and not sitting still. These facts,

combined with the officer's 11 years of law-enforcement experience, provided reasonable suspicion early in the traffic stop of additional illegal activity. This additional reasonable suspicion justified the short delay before the police dog arrived.

Second, the Court finds that the drug dog alerted to the presence of narcotics before she put her nose through the car window. When the dog alerted, officers had probable cause to search the car, so there was no Fourth Amendment violation resulting from the dog briefly putting her nose through the window after the alert. Moreover, the canine officer testified that he did not cue the dog to stick her nose through the window, and the dog's additional activity after the alert was to source the possible location of the narcotics and not to obtain a new or additional alert. Thus, an unlawful search of Castaneda's car did not occur when the dog put her nose through the car window and that officers had independent, lawfully obtained probable cause to search the car before that occurrence.

For these reasons, and as explained in more detail below, the Court finds that the stop was reasonable and that Castaneda was not subjected to an unlawful canine search. Thus, the Court denies Castaneda's motion to suppress.

## 1. Factual and Procedural Background

### A. Factual Background

On September 1, 2021, the Court conducted an in-person evidentiary hearing on Castaneda's motion. Dkt. No. 54. The government called four witnesses: Agent Patterson, Agent Adames, Deputy Montgomery, and Deputy Waddle. The government admitted into

evidence government's exhibits 1–3, and 5.[1]  *Id.*  Castaneda admitted into evidence

defendant's exhibit 1.[2]  *Id.*

The Court finds that Patterson, Adames, Montgomery, and Waddle testified

credibly.  In light of these credibility determinations and suppression exhibits, the Court

makes the following findings of fact.

Investigators with the Taylor County Sheriff's Office received a tip that activity

consistent with drug trafficking was occurring at a house located at 2302 Edgemont Street in

Abilene, Texas.  Suppress H'rg Tr. at 7.  The investigators conducted surveillance on the

residence but did not observe any activity.  *Id.* at 8.  After the Sheriff's Office received at

least one more tip, Patterson and Adames surveilled the residence.  *Id.* at 8, 20.

While surveilling the residence, Patterson and Adames had a clear view of it.  *Id.* at

8.  Shortly after their arrival, Patterson and Adames observed a silver car pull up to the

residence and park in front of it.  *Id.* at 8–9, 20–21.  Then, Castaneda and a female passenger

exited the car and entered the residence.  *Id.* at 9.  When Castaneda entered the residence,

he was carrying a small cooler.  *Id.*  Less than ten minutes later, Castaneda and the

passenger returned the to the car with the small cooler.  *Id.* at 10.  The pair then left the

residence in the car.  *Id.*

Patterson followed the car, and less than one minute after the car left the residence,

Patterson contacted Montgomery and requested that he perform a traffic stop on

Castaneda's car because it had a temporary license plate that was flapping in the wind.  *Id.*

---

[1] These exhibits included: Montgomery's body-camera footage from Castaneda's traffic stop; camera footage of Waddle and the drug dog making passes on Castaneda's car; a map of the route that officers took when they followed Castaneda; and the citation that Deputy Montgomery wrote.

[2] This exhibit is Adames's body-camera footage.

at 10, 12.  Patterson continued to follow the car for approximately five or six miles until Montgomery caught up and made the traffic stop.[3]  *Id.* at 11.

During the stop, Montgomery informed Castaneda that his license plate was flapping in the wind and asked for Castaneda's driver's license.  Gov. Ex. 1 at 0:01–0:28.  Castaneda responded by telling Montgomery that his driver's license was invalid.  *Id.*  After taking Castaneda's name, Montgomery asked Castaneda where he was coming from.  *Id.* at 0:28–1:30.  At first, Castaneda said that he was coming from "a friend's house on Sayles."  *Id.*  Then, Castaneda changed his story and said he met his friend at Cash Savers on First and Sayles.  *Id.*  At the time, Montgomery knew that Castaneda was lying about where he had come from.  Suppress H'rg Tr. at 79–81.

According to Montgomery, Castaneda and his female passenger acted nervous during this interaction.  *Id.* at 50, 75–76.  In particular, Montgomery noticed that Castaneda was jittery, would not look him in the eye, and could not sit still.  *Id.*  Montgomery testified that Castaneda exhibited more nervousness than people normally exhibit when pulled over for a traffic violation.  *Id.*

After receiving Castaneda's passenger's driver's license, Montgomery returned to his patrol car to begin his computer checks regarding Castaneda, his passenger, and his vehicle.  Gov. Ex. 1 at 1:40–2:10.  Before reentering his car, Montgomery stopped to read Castaneda's paper license plate, which was difficult to read because it was curled up and flapping in the wind.[4]  Suppress H'rg Tr. at 52.  Once in his car, Montgomery promptly

---

[3] Castaneda does not challenge the propriety of Montgomery's traffic stop.  Suppress H'rg Tr. at 4–5.

[4] Montgomery's body-camera footage confirms that the license place was hard to read for this reason.  Gov. Ex. 1 at 1:40–2:10.

began completing a field-interview report, which he is required to complete during every traffic stop, and soon thereafter radioed dispatch regarding Castaneda, the passenger, and Castaneda's vehicle. *Id.* at 52–57; Gov. Ex. 1 at 2:10–8:00. While Montgomery was communicating with dispatch, and about five minutes after the start of the traffic stop, Patterson informed him that Waddle, the canine handler, was on his way with the drug dog. Gov. Ex. 1 at 5:00–5:10. In between his communications with dispatch, Montgomery continued to write and work on his field-interview report for the traffic stop. Suppress H'rg Tr. at 54.

As Montgomery completed his routine investigation into the traffic violation, Adames spoke with Castaneda. *Id.* at 35–36. Adames asked Castaneda if he had anything illegal in the car. *Id.* When Castaneda denied having anything illegal, Adames asked Castaneda for consent to search, which Castaneda did not give. *Id.* at 36. During the conversation, Castaneda was uncooperative and argumentative and repeatedly reached into his pockets. *Id.* at 32. When instructed by Adames to keep his hands either in or out of his pockets, Castaneda stated that he was trying to grab cigarettes, and Adames told him he was not allowed to have cigarettes. *Id.* However, Castaneda continued to reach into his pockets despite being instructed not to do so. *Id.* Adames, who was concerned that Castaneda had a weapon, then ordered Castaneda out of the car.[5] *Id.* at 32–33. When asked to exit his vehicle, Castaneda continued to be argumentative. *Id.* at 33. At that point, Adames did not handcuff Castaneda or place him under arrest. *Id.* at 33–35.

About eight minutes into the traffic stop, dispatch confirmed with Montgomery the registration of Castaneda's car and that neither Castaneda nor his passenger had any active

---

[5] Castaneda does not challenge the investigator's request that he exit his car or the pat-down search.

arrest warrants.  Gov. Ex. 1 at 7:00–8:00.  However, dispatch noted that Castaneda's

driver's license had been suspended because he failed to complete a required drug-education

program.  *Id.* at 8:30–9:00.  And at approximately nine and a half minutes after the traffic

stop started, Montgomery completed his call with dispatch and exited his patrol vehicle.  *Id.*

at 9:20.

      After exiting his vehicle, Montgomery asked Castaneda and his passenger for their

contact information—including a phone number and a home address—and for information

regarding their employment.  *Id.* at 9:30–11:10.  Montgomery asked these questions so he

could complete the required field-interview form.  Suppress H'rg Tr. at 58.

      Then, for a about a minute and a half to two minutes, Montgomery stood around,

made small talk with Castaneda and his passenger, and explained to Castaneda's passenger

that he stopped them because the temporary plate was flapping in the wind.  Gov. Ex. 1 at

11:10–13:15.  Montgomery testified that during this time he was deciding whether to issue

Castaneda a traffic citation.  *Id.* at 59.  While Montgomery was deciding, Castaneda's

passenger asked him what they were waiting for.  Gov. Ex. 1 at 12:10–12:24.  Montgomery

responded by stating, "We are waiting for the dog to get here."  *Id.*

      About thirteen and a half minutes into the traffic stop, Montgomery retrieved his

ticket book from his trunk, re-entered his patrol vehicle, and began writing a citation.  *Id.* at

13:30–14:30; Suppress H'rg Tr. at 61.  Montgomery spent about three and a half minutes

writing the citation before initiating a second call to dispatch.  Gov. Ex. 1 at 14:30–18:10;

Suppress H'rg Tr. at 61–62.  During that call, Montgomery asked dispatch again for the

expiration dates of Castaneda's vehicle's registration and of Castaneda's driver's license.

Gov. Ex. 1 at 18:10–19:50.  Montgomery testified that he did not record those dates the first

time that he had received them from dispatch because he did not need them to complete his field-interview report. Suppress H'rg Tr. at 63–64. On the call, Montgomery informed dispatch that he was issuing a citation to Castaneda for driving without a license. Gov. Ex. 1 at 19:50–20:14. Approximately 20 minutes after initiating the traffic stop, Castaneda completed this second call with dispatch. *Id.* After ending the call, Montgomery continued writing the citation and completed a courtesy form, which informs drivers how to contest traffic tickets, up until the time that he exited his car—about 21 and a half minutes after initiating the traffic stop. *Id.* at 20:14–21:30; Suppress H'rg Tr. at 66.

Before Montgomery exited his car with the completed citation and courtesy form and around 21 minutes after Deputy Montgomery initiated the traffic stop, the canine handler began walking around Castaneda's car with the drug dog.[6] Gov. Ex. 2; Suppress H'rg Tr. at 66–67. Waddle first walked to the front of Castaneda's car with the dog. *Id.* Waddle testified that he used a standardized search pattern. Suppress H'rg Tr. at 85, 88, 93, 95. During this first pass, Waddle stopped briefly next to the car's front driver's-side tire. Gov. Ex. 2. Waddle testified that during this pause, the dog was pulling hard and crawling under the car. Suppress H'rg Tr. at 87, 91, 92. According to Waddle, this behavior indicated that the dog had located an odor and was trying to determine its source. *Id.* at 87–88, 91, 92. He interpreted that behavior as an alert. *Id.* Next, Waddle moved to the driver's door of the car. *Id.* at 90–91. When Waddle and the dog passed the door, the driver's window was fully open. *Id.* While passing this location, Waddle continued to use a standard signaling procedure with the dog and did not order the dog to jump onto the

---

[6] By the time Montgomery exited his car after writing the citation, Waddle and the dog had already begun walking around the car. Suppress H'rg Tr. at 66–67.

windowsill.  *Id.* at 93.  However, the dog jumped on the windowsill, stuck her nose through the open window, and sniffed inside the car.  Gov. Ex. 2.

After the dog sniffed through the driver's side window, the pair finished their first pass by moving toward the rear of the car.  *Id.*  The pair then returned to the front of the car to make a second pass.  *Id.*; Suppress H'rg Tr. at 94.  While there, the dog became distracted by another dog.  *Id.*  Waddle was able to get the drug dog to focus again, and the pair began their second pass.  *See id.*  During the second pass, the dog again started climbing under the car—actions that Waddle testified indicated that the dog was alerting again.  *Id.*

As the pair reached the driver's door again, Waddle continued to use a standard high-low pass procedure and standard signaling procedures.  Gov. Ex. 2; Suppress H'rg Tr. at 95.  However, the dog climbed back onto the windowsill, stuck her nose through the window, sniffed, and alerted.  *Id.*  At this point, around 23 minutes into the traffic stop, the pair walked away from Castaneda's car.  Gov. Ex. 2.

The investigators subsequently searched Castaneda's vehicle.  Suppress H'rg Tr. at 16.  During that search, they found narcotics.  *Id.*

### B.    Procedural History

A grand jury indicted Castaneda for (1) Conspiracy to Distribute and Possess with Intent to Distribute 50 Grams or More of Methamphetamine, and (2) Possession with Intent to Distribute 50 Grams or More of Methamphetamine.  Dkt. No. 3.  Castaneda moved to suppress all evidence discovered during the officers' search of his vehicle.  Dkt. No. 42 at 9.  The government responded in opposition.  Dkt. No. 46.

## 2.    Legal Standards

The Fourth Amendment of the United States Constitution grants "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  "Evidence derived from an unreasonable search or seizure generally must be suppressed."  *United States v. Alvarado-Zarza*, 782 F.3d 246, 249 (5th Cir. 2015).

"[O]n a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of [his] constitutional rights."  *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).  But "'if a defendant produces evidence that he was arrested or subject to search without a warrant, the burden shifts to the government to justify the warrantless search.'"  *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993) (quoting *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977)).  Thus, where agents "conduct[] an investigatory stop without a warrant, the government bears the burden of proving, by a preponderance of the evidence, that the investigatory stop was constitutional."  *Guerrero-Barajas*, 240 F.3d at 432.

"The judge's role at a suppression hearing is to determine the credibility of witnesses and find the facts."[7]  *United States v. Jones*, 187 F. Supp. 3d 714, 723 (M.D. La. 2016).  "At a suppression hearing, it is 'well within the trial court's discretion' to weigh the evidence and make credibility determinations regarding conflicting testimony."  *Id.*; *see Norman v. Stephens*, No. CIV.A. H-13-0624, 2013 WL 6498979, at *21 (S.D. Tex. Dec. 11, 2013).

---

[7] *See Norman v. Stephens*, No. CIV.A. H-13-0624, 2013 WL 6498979, at *21 (S.D. Tex. Dec. 11, 2013); *United States v. Jones*, No. CRIM.A. L-12-10, 2012 WL 1309837, at *7 (S.D. Tex. Apr. 16, 2012).

3.      **Analysis**

   A.      **The traffic stop was reasonable because any lengthening of the stop was supported by reasonable suspicion of additional criminal activity.**

   "The protection of the Fourth Amendment 'extends to vehicle stops and temporary detainment of a vehicle's occupants.'" *United States v. Reyes*, 963 F.3d 482, 487 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 861 (2020) (quoting *United States v. Andres*, 703 F.3d 828, 832 (5th Cir. 2013)).  "After lawfully stopping a driver for a traffic violation, an officer's actions must be 'reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place.'" *Id.* (quoting *Andres*, 703 F.3d at 832).  Thus, "[t]he stop may last no longer than necessary to address the traffic violation, and constitutional authority for the seizure 'ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.'" *Id.* (quoting *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)).

   Tasks are tied to a traffic infraction if they "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez*, 575 U.S. at 355.  Beyond determining whether to issue a traffic ticket, such tasks include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* In contrast, a dog sniff "is a measure aimed at detecting evidence of ordinary criminal wrongdoing," "is not an ordinary incident of a traffic stop," and, therefore, "is not fairly characterized as part of the officer's traffic mission." *Id.* at 355–56 (internal quotation marks omitted).

   During a traffic stop, however, officers may engage in "additional investigation unrelated to the safe and responsible operation of the vehicle." *Reyes*, 963 F.3d at 487.  But regardless of whether officers investigate activity unrelated to the traffic stop, they still

"must diligently pursue the investigation of the traffic violation." *Id.* As a result, officers may engage in such investigation "only if [it] does not lengthen the driver's detention or is supported by reasonable suspicion of additional criminal activity." *Id.* Where an "officer develops reasonable suspicion of [additional criminal] activity 'in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed.'" *Id.* at 487–88 (quoting *United States v. Banuelos-Romero*, 597 F.3d 763, 767 (5th Cir. 2010)).

The reasonable-suspicion standard requires "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) (internal quotation marks omitted). To have a reasonable suspicion, an "'officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Reyes*, 963 F.3d at 488 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). This standard "'takes into account the totality of the circumstances—the whole picture.'" *Glover*, 140 S. Ct. at 1191 (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014)). Thus, the analysis "is necessarily fact-specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion." *Reyes*, 963 F.3d at 488 (quoting *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999)). Accordingly, an officer should "consider . . . the events . . . leading up to the search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to a reasonable suspicion." *Id.* (internal quotations omitted). Finally, "a mere 'hunch' does not create reasonable suspicion." *Glover*, 140 S. Ct. at 1187.

At the suppression hearing, the government provided several specific and articulable facts known to Montgomery at the conclusion of his first call with dispatch to support that Montgomery had a reasonable suspicion that Castaneda was engaged in drug trafficking at that time.  First, Montgomery knew that Patterson and Adames were conducting surveillance for narcotics trafficking when they contacted him requesting that he stop Castaneda.  Suppress H'rg Tr. at 75.  Montgomery also knew that the car had a temporary license plate that was not affixed correctly.  *Id.* at 70.  Additionally, when speaking with Montgomery, Castaneda admitted that he did not have a valid driver's license and gave inconsistent stories regarding where he was coming from.  *Id.* at 49, 79; Gov. Ex. 1 at 0:28–1:30, 8:30–8:53.  During this interaction, Montgomery knew that Castaneda lied with respect to where he was coming from.  Suppress H'rg Tr. at 79–81.  Montgomery also noticed that Castaneda was uncharacteristically nervous because he avoided eye contact, was jittery, and could not sit still.  *Id.* at 50, 75–76.  Furthermore, after completing his call with dispatch, Montgomery knew that Castaneda's driver's license had been suspended due to his failure to complete a drug-education program.  Gov. Ex. 1 at 8:30–8:53.  Finally, Montgomery drew on his training and experience when concluding that he had a reasonable suspicion that Castaneda was committing a crime outside of his traffic violation.  *See* Suppress H'rg Tr. at 50, 76.  Considering all of these facts in their totality, the Court finds that Montgomery had, at the very least, a reasonable suspicion that Castaneda was engaged in drug trafficking when he completed his first call with dispatch.

In a case with similar facts to this case—and in a case with fewer specific, articulable facts than are present here—the Fifth Circuit has held that officers had a reasonable suspicion that justified extending a traffic stop beyond the time necessary to investigate a

traffic violation.  First, in *United States v. Reyes*, an officer stopped a truck for speeding and called a canine unit about eight and a half minutes into the traffic stop.  963 F.3d at 485–86.  The canine unit did not arrive until about 32 minutes after the start of the traffic stop.  *United States v. Reyes*, No. 1:18-CR-054-C-1, Dkt. No. 127 at 23 (N.D. Tex. Apr. 25, 2019).  The driver of the truck argued that drugs found in the truck should have been suppressed because the officer had unlawfully extended the traffic stop.  *Reyes*, 963 F.3d at 488.

In affirming the denial of a suppression, the Fifth Circuit noted that the government had presented several specific and articulable facts supporting the officer's reasonable suspicion.  *Id.* at 488.  These facts included (1) that the truck was on a drug-trafficking corridor and came from a city that was a known source of narcotics; (2) the truck was not registered to the driver and had a temporary plate for a different state—activity that drug couriers engage in to avoid forfeiture; (3) the driver was protective of the truck and initially refused to exit it; (4) the driver offered inconsistent and implausible stories about the purpose of her travel; (5) the driver had a conviction for meth; (6) the driver responded evasively when asked if there was anything illegal in the truck; and (7) the officer who stopped the truck drew on his training, education, and experience in narcotics interdiction and his familiarity with the area to determine there was a reasonable suspicion.  *Id.* at 488–89.  Thus, the Fifth Circuit held that, taken together, the facts available to the officer when he called the canine unit gave rise to a reasonable suspicion that justified extending the stop.  *Id.*

The Fifth Circuit reached the same conclusion in *United States v. Pack*.  612 F.3d 361–62.  In *Pack*, an officer extended a 35-minute traffic stop by eight minutes to wait for a canine unit to arrive.  *Id.* at 361.  The evidence showed that the officer, who had 17 years of

law-enforcement experience, observed that the passenger in the car (1) was nervous; (2) gave him conflicting stories; (3) was traveling along a drug-trafficking corridor; (4) had a suspended license; and (5) admitted to prior arrests for theft and fighting. *Id.* Noting these facts, the Fifth Circuit held that the officer had a reasonable suspicion to extend the stop to investigate possible drug trafficking. *Id. at* 361–62. Additionally, noting that the officer promptly called the canine unit that could respond the quickest and that the short eight-minute delay for the canine unit to arrive was reasonable, *Pack* further held that the delay that resulted from waiting for the canine unit did not render the length of the entire detention unreasonable. *Id.* at 361–62.

Here, the evidence indicates that Castaneda's traffic stop, which lasted only about 21 minutes before the arrival of the drug dog and 23 minutes before Waddle and the drug dog completed their second pass (*See* Gov. Exs. 1, 2), was shorter than that in *Reyes.* Additionally, like it did in *Reyes*, the government presents specific and articulable facts known by Montgomery at the time he finished his first call with dispatch to support his reasonable suspicion. These facts include (1) Montgomery had knowledge of Patterson and Adames's narcotics surveillance of Castaneda (Suppress H'rg Tr. at 75); (2) Castaneda's car had a temporary license plate (*Id.* at 70);[8] (3) Castaneda was unusually nervous during the traffic stop (*Id.* at 50, 75–76); (4) Castaneda lied about where he had come from (*Id.* at 79–81); (5) Castaneda's license was suspended for failure to complete a required drug-education program (*Id.* at 49; Gov. Ex. 1 at 8:30–8:53); (6) Castaneda offered two inconsistent stories about where he had come from (Gov. Ex. 1 at 0:28–1:30; Suppress H'rg Tr. at 79); and

---

[8] "Paper license tags are often used by drug-traffickers." *United States v. Garcia*, 726 F. App'x 975, 976 (5th Cir. 2018).

14

(7) Montgomery drew on his experience working patrol to determine that he had reasonable suspicion to continue to detain Castaneda (*See* Suppress H'rg Tr. at 50, 76).  Given the factual similarities between this case and *Reyes*—and the fact that the drug dog arrived about ten minutes quicker than the drug dog in that case—*Reyes* supports the conclusion that Montgomery had a reasonable suspicion to extend the length of the traffic stop when he finished his first call with dispatch.

Additionally, like the officer in *Pack*, Montgomery, who had about 11 years of law-enforcement experience (Suppress H'rg Tr. at 68), observed that Castaneda (1) was unusually nervous (*Id.* at 50, 75–76); (2) gave conflicting stories about where he had come from (*Id.* at 79; Gov. Ex. 1 at 0:28–1:30); (3) was being surveilled by narcotics officers (Suppress H'rg Tr. at 75); (4) had a suspended license (Gov. Ex. 1 at 8:30–9:00); and (5) needed to complete a required drug-education program (*Id.*).  Additionally, unlike the officer in *Pack*, Montgomery also knew that each of Castaneda's inconsistent stories as to where he had come from were lies.  Suppress H'rg Tr. at 79–81.  Thus, the Court finds that *Pack* also supports the conclusion that Montgomery had a reasonable suspicion to extend Castaneda's traffic stop when he finished his first call with dispatch.

Moreover, as in *Pack*, officers here requested the drug dog soon after the beginning of the stop.[9]  *Id.* at 5:00–5:10.  Also, with the exception of the roughly one and a half to two minutes that he spent standing around and making small talk with Castaneda and his passenger after completing his first call with dispatch, Montgomery spent the entirety of the

---

[9] Agent Patterson testified that as soon as Montgomery left Castaneda's window to start computer checks, he called for the dog.  Suppress H'rg Tr. at 23.  Additionally, Montgomery's body-camera footage shows that the dog was on its way no later than five minutes after the start of the traffic stop. *Id.* at 5:00–5:10.

stop filling out a field-interview report, contacting dispatch, writing a citation, and filling out a courtesy form.  Suppress H'rg Tr. at 48–66.  Accordingly, the Court finds that even if Montgomery extended the time of the traffic stop, he did so by no more than one and a half to two minutes.[10]  *See id.*  Furthermore, because the total length of the stop and any delay in this case were significantly shorter than those in *Pack*, the Court finds that Castaneda's stop and any delay were minimal and, therefore, reasonable.

In an attempt to avoid this conclusion, Castaneda argues that under *United States v. Spears*, 636 F. App'x 893 (5th Cir. 2016), Montgomery did not have a reasonable suspicion that he was engaged in criminal activity outside of his traffic violation.  Dkt. No. 42 at 6–8.  But *Spears*, in addition to being unpublished, is distinguishable.  In *Spears*, officers detained a driver whom they had stopped for a traffic violation after completing their routine computer checks.  636 F. App'x at 901.  The government argued that those officers had a reasonable suspicion of criminal activity beyond the traffic violation because the driver lied about where he was coming from, appeared nervous, was evasive, noncompliant, and argumentative, and had a backpack in his car in plain view.  *Id.* at 902.  With respect to the purported lie, the court noted that the driver's comment that he visited a relative was not inconsistent with the officers' observation that he visited a house for a short period of time. *Id.*  Additionally, with respect to the driver's nervousness, the court noted that the only evidence of that fact was a general statement that he was nervous.  *Id.* at 902–03.  Moreover, the court noted that the driver's evasiveness, noncompliance, and argumentativeness did not

---

[10] Because there were 12 minutes between the time that Montgomery finished his call with dispatch and the time that the drug dog arrived, even if Montgomery's actions after he finished his first call with dispatch were not reasonably related to the purpose of the traffic stop, the stop was delayed by only 12 minutes.  Gov. Ex. 1 at 9:00; Gov. Ex. 2.

rise to the level of reasonable suspicion because he eventually complied with instructions. *Id.* at 903. Finally, the court noted that the presence of the backpack did not create a reasonable suspicion because backpacks have a multitude of innocent uses, the officers did not observe any movement of the backpack, and the officers did not see it until after they stopped the driver's vehicle. *Id.* at 903–04. Thus, *Spears* held that the totality of circumstances did not create a reasonable suspicion of criminal activity that justified the extended detention of the driver. *Id.* at 904.

Here, unlike the officers in *Spears*, Montgomery knew that Castaneda lied to him about his prior whereabouts. Suppress H'rg Tr. at 79–81. Additionally, not only did Montgomery know that Castaneda had lied, but he also knew that Castaneda had lied after being surveilled by narcotics officers. *See id.* at 75, 79–81. Also, in contrast to the officers in *Spears*, Montgomery provided more than just conclusory testimony that Castaneda was nervous. *Id.* at 50, 75–76. In fact, Montgomery testified that he concluded that Castaneda was unusually nervous for being a driver during a traffic stop based on his body language, including his jitteriness, inability to make eye contact, and inability to sit still. *Id.* And, unlike the officers in *Spears*, Montgomery listened to Castaneda offer two incompatible stories as to where he had come from and knew that Castaneda's license was suspended because he had not completed a required drug-education program. Gov. Ex. 1 at 8:30–9:00. Thus, the facts of this case are distinguishable from *Spears*, and *Spears* does not support or compel the conclusion that when Castaneda's traffic stop was extended, Montgomery lacked a reasonable suspicion of criminal activity unrelated to the traffic violation.

Castaneda also argues that *Spears* holds that a person's presence in an area known to be high in crime alone does not support a reasonable suspicion that the person is involved in

drugs, but this argument is inapplicable under the facts presented in the parties' briefing. *Spears* did hold that an individual's presence in an area known to be high in crime, standing alone, is not sufficient to support a reasonable suspicion that anyone in that location is engaging in illegal activity.  *See* 636 F. App'x at 899.  But, as discussed above, Montgomery relied on more than just the fact that Castaneda was being surveilled by narcotics officers to develop a reasonable suspicion that Castaneda was engaging in criminal activity unrelated to the activity that formed the basis for his stop.  Thus, the Court finds that, in contrast to Castaneda's contention, this is not a case where officers relied only on Castaneda's presence in a possible high-crime area when they decided to extend his traffic stop beyond the time reasonable to investigate his traffic violation.

Considering the parties' briefing and argument, the evidence that the government presented at the suppression hearing, and the facts and holdings of *Reyes*, *Pack*, and *Spears*, the Court finds that Montgomery possessed sufficient specific and articulable facts at the conclusion of his first radio call to dispatch to support a reasonable suspicion that Castaneda was engaging in illegal activity beyond his traffic violation.

Although the facts discussed thus far are sufficient to support this finding, the finding is only strengthened when the facts known to Patterson and Adames are imputed to Montgomery.  "Reasonable suspicion to stop a vehicle, or probable cause to conduct a search, may arise through the collective knowledge of the officers involved in the operation."  *United States v. Zuniga*, 860 F.3d 276, 282 (5th Cir. 2017).  This "theory applies so long as there is some degree of communication between the acting officer and the officer who has knowledge of the necessary facts."  *Id.* at 283 (internal quotation marks omitted).  Additionally, a single officer need not be fully aware of all the facts necessary to create a

reasonable suspicion; therefore, reasonable suspicion can arise from information in the possession one officer added to that in the possession of another officer with whom the first officer communicated. *See United States v. Gonzalez*, 637 F. App'x. 136, 137 (5th Cir. 2016) (holding that the collective knowledge of multiple officers can be added together as long as the officers communicated when considering whether an officer had reasonable suspicion).

Patterson and Adames communicated with Montgomery when they asked him to stop Castaneda and during the traffic stop. Suppress H'rg Tr. at 22, 24–25, 46, 81–82. They were also present at the traffic stop and remained in communication and coordination with Montgomery. *Id.* at 14, 23, 25, 35, 56, 74. Thus, their knowledge of Castaneda's activities can be imputed to Montgomery for the purposes of determining whether Montgomery had a reasonable suspicion to extend the traffic stop.

Here, Patterson and Adames watched Castaneda enter a house that they were surveilling for narcotics-trafficking activity. Suppress H'rg Tr. at 8–9. They watched Castaneda carry a small cooler into the house, stay for a short period of time, and return to his car with the small cooler. *Id.* at 8–10. Patterson drew on his narcotics experience to conclude that Castaneda's behavior was consistent with the transportation of narcotics. *Id.* at 27. Imputing all of these facts to Montgomery, in addition to the facts that he knew at the time that he completed his first call with dispatch, further confirms that Montgomery had a reasonable suspicion that Castaneda was engaging in illegal activity beyond his traffic violation. Thus, the Court finds that, regardless of whether Castaneda's traffic stop

19

exceeded the time reasonable to investigate his traffic violation, the stop was reasonable and did not violate Castaneda's Fourth Amendment rights.[11]

### B.  Because Waddle did not prompt the dog to enter the window and, in any event, the dog alerted prior to climbing up to the window, the officers lawfully obtained probable cause to search Castaneda's car.

Castaneda's challenge to the canine sniff is likewise undermined by the facts as established at the hearing and relevant case law.  "A positive alert by a drug-detecting dog creates probable cause for a search of the vehicle."  *United States v. Rodriguez-Flores*, 249 F. App'x 317, 323 (5th Cir. 2007).  And a sniff performed during the lawful detention of an individual does not implicate the Fourth Amendment.  *Id.*  However, "[t]he Fourth Amendment comes into play when an officer facilitates, encourages, or prompts a drug dog to enter a vehicle."  *United States v. Shen*, 749 F. App'x 256, 262 (5th Cir. 2018).

Absent evidence that a dog handler cued a drug dog to enter an open car window, the fact that a drug dog entered an open car window does not turn the dog's sniff into an unlawful search.  *See Shen*, 749 F. App'x at 262–63.  For example, in *Shen*, the driver of a car argued that officers engaged in an unlawful search by directing a drug dog to stick her head into the car.  *Id.* at 262.  The Fifth Circuit noted that the driver pointed to no evidence

---

[11] Castaneda argues that his traffic stop was unreasonable because it exceeded the reasonable amount of time to investigate his traffic violation.  Dkt. No. 42 at 5–8.  Some considerations support Castaneda's argument, including that (1) Montgomery paused during the traffic stop, and when asked what the officers were waiting for, he responded by stating that the officers were waiting for the dog to arrive (Suppress H'rg Tr. at 59); and (2) Montgomery admitted that he did not think time was of the essence (*Id.* at 59–60).  At the suppression hearing, Castaneda argued that the earliest point at which Montgomery delayed the traffic stop was when he got out of his patrol car after finishing his first call with dispatch.  Suppress H'rg Tr. at 118.  But because the Court finds that Montgomery had a reasonable suspicion to extend the traffic stop after he completed his first call with dispatch, it need not resolve this issue.  *See Reyes*, 963 F.3d at 488 (declining to decide whether an officer gained reasonable suspicion to prolong a stop within the time reasonably necessary to conduct the stop where officers had reasonable suspicion to extend the stop before the earliest time that the defendant argued the stop should have completed).

indicating that the officer directed the dog to enter the window.  *Id.*  As a result, the Fifth Circuit held that the district court did not err by finding that the officer used a standard high-and-low pass procedure with the dog and did not improperly cue the dog.  *Id.* at 263.  Thus, the Fifth Circuit further held that the dog's sniff through the open window did not become unlawful merely because the window was down and the dog entered it.  *Id.*  Accordingly, *Shen* held that the officer's use of the drug dog did not amount to an unlawful search of the driver's car.  *See id.*

Here, Castaneda argues that he was subjected to an unlawful search when the drug dog stuck its nose through his open driver's door window because Waddle directed, encouraged, and prompted the dog to take that action.  Dkt. 42 at 8–9.  However, the Court finds that Waddle did not direct the drug dog to enter Castaneda's car window and, instead, used standard search patterns and signals to guide her.  Suppress H'rg Tr. at 85, 88, 93, 95.  Because Waddle did not direct the dog to stick her nose through the window, the Court finds that an unlawful search did not occur at that point.

Additionally, regardless of whether the dog's sniff through the window amounted to an unlawful search, officers still lawfully obtained probable cause to search Castaneda's car independently of and prior to this occurrence.  "Evidence not obtained as a result of police illegality, but rather through a legal, independent source, need not be suppressed."  *United States v. Oliver*, 630 F.3d 397, 408 (5th Cir. 2011).  Thus, where it cannot be shown that the evidence at issue would not have been uncovered but for an illegal search, the evidence need not be suppressed.  *See id.*

During Castaneda's traffic stop, prior to sticking her nose through the window, the drug dog alerted when she climbed up under the car near its front driver's side wheel.

21

Suppress H'rg Tr. at 91–92; *see* Gov. Ex. 2.  The canine officer testified that, after the alert, the sweep continued as a means of sourcing the possible location of the narcotics, not because an additional alert was necessary.  Suppress H'rg Tr. at 91.  Because a positive alert by a drug dog creates probable cause to search a vehicle—and this alert occurred before the dog's nose entered Castaneda's window—the Court finds that regardless of whether the dog's breach of the window amounted to an unlawful search, officers had independent, legally obtained probable cause to search Castaneda's car prior to that event.

**4.   Conclusion**

The Court denies Castaneda's motion to suppress.  Dkt. No. 42.  The government demonstrated—through testimony, video footage, and documentary evidence—that (1) even if the traffic officer's actions were not reasonably related in scope to the circumstances that justified the stop, the officer developed reasonable suspicion of additional criminal activity in the course of the stop and before the initial purpose of the stop had been fulfilled; (2) the dog's sniff did not rise to the level of an unlawful search; and (3) even if the dog's sniff did amount to an unlawful search, officers had already lawfully obtained probable cause to search the car based on a prior alert.  Therefore, for the reasons described above, the Court rejects each of Castaneda's grounds for suppression and denies his Motion to Suppress Evidence.

So ordered on September 8, 2021.

_____
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE